UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

ROBERT JACOBY,
JUDY JACOBY,

        Plaintiffs,

        v.                                          Case No. 09-C-0875

KEVIN A. DUDLEY,
CITY OF MILWAUKEE,

        Defendants.

---

DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
(DOC. 44) AND DISMISSING CASE

The Jacobys sue the City of Milwaukee and its former police officer Kevin Dudley regarding how Dudley stranded them while a potentially armed man was chasing and threatening to kill them. Unfortunately for the Jacobys, constitutional law provides no remedy.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving parties bear the initial burden of demonstrating they are entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once that burden is met, the nonmoving parties must designate specific facts to support or defend each element of their cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the

evidence in the light most favorable to the parties opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

## UNDISPUTED FACTS

On September 13, 2006, Robert Jacoby was walking his dog, heading west on Clarke Street from 51st Street, in Milwaukee. (Pl.'s Proposed Findings of Fact ("PPFOF") ¶ 1; Def.'s Reply to Pl.'s Proposed Findings of Fact ("Def.'s Reply") ¶ 1; PPFOF Ex. Jacoby Dep. at 12.[1]) Jacoby intended to go up 55th Street but turned on 54th Street because he was being yelled at by Corey Flenorl. (PPFOF ¶ 2.) Flenorl was telling Jacoby to "get the hell away" and asking "what's this cracker ass doing here?" (PPFOF ¶ 3.) Jacoby headed north on 54th Street toward Center Street, where he encountered a group of children. (PPFOF ¶¶ 4, 5; Def.'s Reply ¶ 5.) Jacoby heard Flenorl yelling "stay away from that cracker. He's a pervert. I'm going to kill him." (PPFOF ¶ 5.) At that point, Jacoby started walking faster toward Center Street and called his wife, Judy, after he tried but failed to call

---

[1]The parties do not state that these events took place in Milwaukee, but the court takes judicial notice that the locations of the intersections and streets mentioned are within the boundaries of the City of Milwaukee.

2

911 from his cell phone. (PPFOF ¶ 6; Def.'s Reply ¶ 6; PPFOF ¶ 9.) He told his wife that a guy was threatening him and to call the police. (PPFOF ¶ 7.)

After Flenorl yelled again, Jacoby turned and saw Flenorl on the corner pointing at him as though he was going to shoot. (PPFOF ¶ 8.) Jacoby called his wife again and asked her if she had called 911; she said she had. (PPFOF ¶ 9.) He then walked toward the corner of Center Street and 51st Street and saw his wife walking toward him. Jacoby flagged down a squad car on 51st Street. (PPFOF ¶ 10.)

Jacoby approached the window of the squad car and asked Milwaukee Police Officer Kevin Dudley if he was there for him; Dudley replied "no." (PPFOF ¶ 12.) Jacoby told Dudley that a man was chasing and threatening to kill him. (PPFOF ¶ 13.) Dudley turned around in his car and did not see anyone. (PPFOF ¶ 14.) He then told Jacoby that police were on the way and left.[2] (PPFOF Ex. Jacoby Dep. at 23; PPFOF ¶ 16; *see* PPFOF ¶ 15; Def.'s Reply ¶ 15.) After Dudley left, Jacoby stayed near the intersection of

---

[2]The Jacobys' proposed finding of fact asserts that Dudley instructed Jacoby "to 'wait right there' another squad would be coming to help him." (PPFOF ¶ 15.) However, the deposition testimony cited in support reads as follows:

    Q    Did you say, hey, he was over there? Do [sic] you do anything like that?
    A    I wasn't given that opportunity.
    Q    What happened then?
    A    Officer Dudley told me they were on the way and he left.
    Q    Did you ask him not to leave?
    A    No.
    Q    Did you say, hey, can I get in your car? Can you give me a ride home?
    A    I wasn't given that opportunity.
    Q    Did you ask that?
    A    The car left.
    A    Did you ask that?
    A    No.
    Q    What happened then?
    A    I, as instructed, waited for the police to come.

(PPFOF Ex. Jacoby Dep. at 23.) Thus, the only statement actually attributed to Dudley is that he said another squad was on its way, not that Jacoby should "wait right there." Jacoby's testimony indicates that Jacoby interpreted Dudley's comment as an instruction to wait there, but not that Dudley actually gave that instruction.

3

51st and Center Streets because he "was told by the officer that the police were on the way. I felt I had to stay there." (PPFOF ¶ 17.)

While the Jacobys waited for police to arrive, Flenorl came charging from a car with a hand behind his back, yelling "I'm going to kill you." (PPFOF ¶ 18.) Jacoby then ran into Center Street attempting to cause a commotion. He either hit a vehicle or the vehicle hit him. (PPFOF ¶ 19.) At that point, everyone around Jacoby started screaming at Flenorl and Flenorl left. (PPFOF ¶ 20.)

Dudley was first hired and assigned to the Milwaukee Police Academy in 1985 but was dismissed prior to working as a police officer for unsatisfactory performance. (Def.'s Proposed Findings of Fact in Supp. of Def.'s Mot. for Summ. J. ("DPFOF") ¶ 1.) In 1995, the Fire and Police Commission of the City of Milwaukee approved hiring Dudley again. Dudley began and completed his course of recruit training that year. (DPFOF ¶ 2.) In 1997, he was reprimanded for failing to appear in court in response to a subpoena and for backing his squad car into a pole. (DPFOF ¶¶ 3, 4.) In 1998, Dudley was counseled in a nondisciplinary manner on citizen contacts. (DPFOF ¶ 5.) In 1999, he received an official reprimand for referring to a female police officer in an offensive manner. (DPFOF ¶ 6.) In 2000, Dudley received an official reprimand for failing to appear in court. (DPFOF ¶ 7.) In 2002, Dudley was suspended for one day for sleeping on duty, though the suspension was later reduced to an official reprimand. (DPFOF ¶ 8.) He received a district-level reprimand in 2005 for failing to operate his squad car in a safe manner, in connection with a traffic accident; an official reprimand for failing to be civil and courteous to a citizen; and two one-day suspensions for failing to be civil and courteous to other police officers. (DPFOF ¶¶ 10-12.) In March 2006, Dudley received two official reprimands and a two-day

4

suspension for three offenses: failing to summon a supervisor to a scene as requested by a citizen, failing to be civil and courteous, and interfering in the private business of another. (DPFOF ¶ 13.) Lastly, Dudley received a district-level reprimand in August 2006, for failing to investigate a citizen's complaint properly. (DPFOF ¶ 14.)

Dudley was discharged from the Milwaukee Police Department for failing to render services in an efficient manner and for failing to be civil and courteous in the incident involving Jacoby. (PPFOF ¶ 23; DPFOF ¶ 16.) Former City of Milwaukee Police Chief Nanette Hegerty testified at deposition that "[o]fficers have discretion as to how they handle certain complaints. However, in this particular case, [Officer Dudley] refused to help Mr. Jacoby at all. He did not provide any response to Mr. Jacoby's complaint." (PPFOF Ex. Hegerty Dep. at 26-27.) Chief Hegerty believed that once Jacoby flagged Dudley down, Dudley had a responsibility to do something. (*Id.* at 26.)

## CLAIMS AGAINST DUDLEY

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that (1) he was deprived of a right secured by the Constitution or laws of the United States and (2) the deprivation was inflicted by a person acting under color of state law. *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). That Dudley was acting under color of state law is undisputed.

In their complaint, the Jacobys assert that at least part of Dudley's motivation for his conduct was race. In their summary judgment brief defendants challenged whether the Jacobys could support an equal protection claim with evidence. The Jacobys, in response, did not argue any equal protection claim; they argued only a substantive due process

5

claim. (*See* Pls.' Br. in Resp. at 5.) As a result, they have abandoned any equal protection claim.

The Fourteenth Amendment provides, among other things, that no state shall deprive any person of liberty without due process of law. U.S. Const. amend. XIV § 1. A person holds a liberty interest in his or her own physical safety. *See Stevens v. Umsted*, 131 F.3d 697, 701 (7th Cir. 1997). The due process clause of the Fourteenth Amendment places a limitation on the state's power to affect a person's liberty interest in safety; however, it generally does not impose upon the state a duty to protect individuals from harm by private actors. *Buchanan-Moore*, 570 F.3d at 827. The clause's purpose is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).[3] Put another way, a state's failure to protect a person from private injury does not violate that person's substantive due process rights. *Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 665 (7th Cir. 2005).

Two exceptions to *DeShaney's* rule are recognized. *Buchanan-Moore*, 570 F.3d at 827. First, the state must protect individuals with whom it has a special relationship. *Id.* For instance, when a state maintains custody over a prisoner or an involuntarily committed mental patient, it must protect him or her because no alternate avenues of aid exist. *See id.*; *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998). Second, the "state-created danger

---

[3]Social workers had received complaints that Joshua DeShaney's father was abusing Joshua, age five, but they did not remove Joshua from his father's custody. Thereafter, Joshua's father beat him so severely that Joshua suffered permanent brain damage. Joshua and his mother filed a § 1983 case against the social workers and department of social services, alleging that Joshua's right to liberty was violated when the officials failed to intervene to protect him from his father. The Supreme Court disagreed, holding that the state's failure to protect Joshua against private violence did not infringe Joshua's substantive due process rights.

6

exception" provides that "liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Buchanan-Moore*, 570 F.3d at 827 (internal quotation marks omitted). The Jacobys argue this second exception, i.e., that Dudley placed them in a position of danger that otherwise would not have existed. (Pls.' Br. in Resp. at 5.)

Inaction by a state actor in the face of a known danger is not enough to trigger a duty to protect one private citizen from another. *Stevens*, 131 F.3d at 705. If the most that can be said is that state actors stood by and did nothing when circumstances suggested that more action was required, then the plaintiff's claim must be rejected. *See DeShaney*, 489 U.S. at 203. Although inaction in such a situation may be condemnable, it is not a basis for § 1983 liability.

For a plaintiff to meet the state-created danger exception, "the state, by its affirmative acts, must [have] create[d] or increase[d] a danger faced by an individual." *Buchanan-Moore*, 570 F.3d at 827. The Jacobys must show that some affirmative act by Dudley created a danger for them or rendered them more vulnerable to an existing danger. *See Stevens*, 131 F.3d at 705. An increase in danger or vulnerability "must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect." *Sandage v. Bd. of Comm'rs*, 548 F.3d 595, 599 (7th Cir. 2008). Increased vulnerability or danger "mean[s] the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Id.* at 600. Here, both parties point to a discussion of the elements of the state-created danger exception by the late District Judge Thomas C. Curran, including that "the state actor[] used [his] authority to create an opportunity that otherwise would not have existed

7

for the third party's crime to occur. (*See* Pls.' Br. in Resp. at 5-6 (quoting *Hodgson v. Miss. Dep't of Corr.*, 963 F. Supp. 776, 794 (E.D. Wis. 1997)).)

According to the record, Dudley committed no affirmative act that created a danger for the Jacobys or rendered them more vulnerable to an existing danger. Dudley drove off leaving the Jacobys where they had been, with Flenorl nearby but out of sight, essentially no different than if Dudley had not stopped at all. That Chief Hegerty thought Dudley had a responsibility to the Jacobys under police rules is immaterial; police rules differ from constitutional law. As Chief Hegerty noted, Dudley failed to help Jacoby at all. And if a failure to help did not constitute a violation of Joshua DeShaney's due process rights (social workers presumably saw Joshua at times yet left him with his father), Dudley's failure to protect the Jacobys did not constitute a violation of the Jacobys' due process rights. The Jacobys argue that by driving off Dudley created an opportunity for Flenorl that did not exist while Dudley remained at the scene. But that is not the test. The Jacobys were in danger before Dudley arrived. And, while Dudley's presence or the presence of another police officer may have provided safety, Dudley's departure from the scene where he encountered the Jacobys did not change or eliminate the danger the Jacobys faced at the moment he drove up.

One additional fact warrants comment, as Dudley did not drive off without speaking. According to Jacoby's version of the facts, which must be believed, Dudley told him that another squad car was on its way, and Jacoby interpreted the comment as an instruction to stay put and to wait for police to arrive. The Jacobys maintain that this affirmative statement by Dudley put them in more danger because they would have gone to a safer location before Flenorl turned up again, which he did.

8

However, no reasonable jury would find that Dudley's statement that another squad car was on its way placed the Jacobys in greater danger than they were already. Dudley gave no time frame for the other squad car's arrival, and he did not utter an imperative to the Jacobys to stay there. Although he may have raised their hopes that another squad car would follow shortly, Dudley made no promises and did not issue a command that the Jacobys remain rooted to the spot. They were free to believe him or disregard his comments; they interpreted his words broadly to indicate they should remain there, but that was not the only course of action they had. Dudley's words did not "turn[] a potential danger into an actual one," *see Sandage*, 548 F.3d at 599. The danger already existed. By his words, Dudley did not use his authority to create an opportunity for Flenorl that would not otherwise have occurred.[4]

The Jacobys liken this case to *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), in which the police arrested a driver; impounded the car and had it towed; then drove off, leaving the passenger in the vehicle, stranded and forced to walk home at night through a high-crime area. The passenger accepted a ride from a stranger and was driven to a secluded area and raped.

The Ninth Circuit found that Wood raised a triable issue of fact as to whether the officer placed her in a position of danger *See id.* at 589-90. Similarly, the Jacobys liken this case to *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), in which police arrested the original driver of a car, leaving the keys in the hands of a passenger they knew to be drunk.

---

[4]Moreover, the Jacobys do not provide evidence suggesting that the time between Dudley's departure and Flenorl's arrival was enough that Dudley's comment made a difference. It appears that at the most some minutes passed before Flenorl arrived. But in any event, no reasonable jury could find that Dudley's comment created or enhanced the dangerous situation.

9

The passenger then drove the car and caused a fatal accident. The Seventh Circuit found, taking the complaint as true, that the officers affirmatively created a dangerous situation for others on the road or rendered citizens more vulnerable to a danger than they otherwise would have been.

But the officers' actions in *Wood* and *Reed* substantially exceeded what Dudley did here. In both *Wood* and *Reed*, officers altered the situation, creating or increasing the danger to Wood or the public. Here, Dudley's inaction and statement to the Jacobys that another squad was on the way merely left the situation as he found it.

Fortunately, no one was killed by Flenorl. And Dudley's disciplinary record before the event in question was not a good one. But although Dudley's conduct toward the Jacobys was disheartening and resulted in his termination as a police officer, no reasonable jury could find that it met the requirements for the state-created danger exception to *DeShaney's* rule.

## CLAIMS AGAINST THE CITY OF MILWAUKEE

The holding that Dudley committed no due process violation also means that the Jacobys cannot maintain their claim against the City for failure to train, supervise, or discipline Dudley. *See Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000) (stating that a municipality's liability for constitutional injury requires a finding that the individual officer is liable on the underlying claim); *see also Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 465 (7th Cir. 2007) ("Because we have determined that all of plaintiffs' claims under federal law were properly dismissed, there can be no § 1983 liability for Boone County either."). The undisputed facts show that Dudley committed no constitutional

10

violation, so there is nothing on which to base municipal liability relating to Dudley's actions.

## CONCLUSION

For these reasons,

IT IS ORDERED that the defendants' motion for summary judgment (Doc. 44) is granted and this case is dismissed.

Dated at Milwaukee, Wisconsin, this 27th day of August, 2012.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE